**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

7 AT BLUE LAGOON (1), LLC,

7 AT BLUE LAGOON (2), LLC,

Debtors.

________________________________/

In re: Case 25-21286-RAM

Jointly administered with
Case 25-21287-RAM

**RBL'S MOTION FOR SUMMARY JUDGMENT IN ITS FAVOR AS TO ALL OBJECTIONS TO ITS BACK-UP BID AND FOR APPROVAL OF ITS BACK-UP BID**

RIC (Blue Lagoon), LLC ("RBL"), as assignee of TIG Romspen U.S. Master Mortgage LP ("Romspen"), by undersigned counsel, pursuant to the Court's October 5, 2026 scheduling order (DE #396) and Federal Rules of Bankruptcy Procedure 7056 and 9014(c), moves for entry of an order (1) granting this motion and approving a sale of the subject Property[1] to RBL pursuant to RBL's credit plus cash bid ($23,425,000 credit plus $500,000 cash) (the "Back-Up Bid"), and (2) requiring the Debtors to convey the subject Property to RBL, free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. § 363(f), except liens for unpaid real estate taxes and City of Miami code violations, upon payment by RBL to the bankruptcy estate of the cash portion of the Back-Up Bid. RBL states the following in support of its motion:

---

[1] The subject Property is all right, title and interest of the Debtors in approximately 6.9 acres of vacant land owned by them, having a street address of 4865 N.W. 7th Street, Miami, FL and having the legal description set forth in Exhibit A to the Court's August 27, 2026 Order Approving Sale of Debtors' Property Free and Clear of Liens, Claims, Interests and Encumbrances (DE #310) (the "Sale Approval Order"). The tax folio numbers are 01-3131-010-0050, 01-3131-010-0051 and 01-3131-010-0052.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**STATE COURT HISTORY**

1. The mortgage loan made by Romspen to the Debtors went into default when the Debtors did not repay the loan on the October 1, 2022 maturity date. In addition, the Debtors failed to pay the 2020, 2021 and 2022 real estate taxes resulting in tax certificates and tax deed applications. As a result, Romspen paid a total of $580,578.53 for delinquent taxes to protect its collateral.[2] The Debtor also failed to provide proof of the insurance as required by the loan documents. Declaration of Michelle Hendler ("Hendler") (Ex. "A" hereto), ¶ 6.

2. As a result of these circumstances, on or about May 31, 2023, Romspen filed a foreclosure action in state court. Hendler, ¶ 8. Romspen moved for summary judgment of foreclosure, and, on August 10, 2024, the state court entered a final judgment of foreclosure in favor of Romspen (*in rem* only), reserving jurisdiction to award Romspen's attorney's fees and costs. Hendler, ¶ 15.

3. Nearly eight months later, the parties attended a mediation on April 3, 2025 at which the Debtors were represented by Michael Schlesinger. As a result of the mediation, the parties entered into a settlement agreement. Hendler, ¶¶ 16-17. The Debtors agreed that if they did not pay the settlement amount (which reflected a discount) by August 4, 2025, a date four months after the mediation, Romspen would be entitled to an unopposed foreclosure sale at the earliest possible date. *Id*., ¶ 18.

4. In the settlement agreement, the Debtors expressly agreed that they would not "take any other action which would interfere with, delay or frustrate . . . entry of an order setting foreclosure sale and/or the occurrence of the foreclosure sale and/or issuance of the Certificate of

[2] The Debtors have not paid the real estate taxes for 2023, 2024 or 2025. DE #216, p. 2.

Sale or Certificate of Title, and/or . . . the completion of the foreclosure sale pursuant to the Final Judgment and the issuance of a Certificate of Title." *Id*.

5. During the foreclosure action, the Debtors stated on several occasions[3] that they were working on obtaining refinancing, but it never materialized. Hendler, ¶¶ 10-13. After the mediated settlement agreement was reached, on August 8, 2025, the Debtors moved for an extension of the August 11, 2025 payment deadline (Romspen had previously granted a one-week extension). Hendler, ¶ 20. They asserted that the Debtors were "actively working" to secure financing and that they needed only thirty (30) more days, to September 5, 2025. *Id*. This motion was filed by Adeena Weiss, acting as counsel for the Debtors. *Id*. The state court denied this motion. Hendler, ¶ 21.

6. On August 12, 2025, the state court entered a supplemental judgment in favor of Romspen for attorney's fees and costs that had been agreed upon in the mediated settlement and for additional fees and costs that had been incurred thereafter. This supplemental judgment scheduled a foreclosure sale for September 29, 2025. Hendler, ¶ 22.

7. On September 24, 2025, Debtors, acting through another new counsel, Martin McCarthy, filed an emergency motion to postpone the September 29, 2025 foreclosure sale. In this motion, the Debtors asserted, among other things, that Mrs. Weiss had lacked capacity to mediate on April 3 as a result of a shoulder injury that occurred on July 15, 2025, more than three months *after* the mediation.[4] *Id*., ¶ 23.

[3] Some of the statements about working on a refinancing are recounted in the Declaration of Michelle Hendler, ¶¶ 10-13. On one occasion, at an in-person hearing on December 20, 2023, Caroline Weiss testified that (i) she had been working on refinancing starting as far back as April, 2023; and (ii) the Debtors had "two standby lenders right now." Hendler, ¶ 10.

[4] During these Chapter 11 cases, RBL took the Rule 2004 examination of the mediator, Harry Schafer, who attested that Mrs. Weiss attended the entire mediation by Zoom as the representative of the Debtors. DE #149-1, Tr. pp. 15-18. He also testified that he would never

8. By order of September 25, 2025, the state court denied this motion, terming it a "farce." The state court judge, Judge Rebull, wrote his own order. *Id.*, ¶ 24. In the order, Judge Rebull explained that the court had observed Mrs. Weiss on numerous occasions during the litigation and that it was "preposterous" to assert that she lacked capacity.[5] *Id.*

**BANKRUPTCY COURT PROCEEDINGS**

**The January 22, 2026 Agreed Order**

9. On September 26, 2025, one business day before the scheduled September 29 foreclosure sale, Debtors each filed a Petition for relief under Chapter 11 of the United States Bankruptcy Code. On October 9, 2025, RBL filed a motion to dismiss the Chapter 11 cases or, alternatively, for the appointment of a Chapter 11 trustee. DE #17. The Court set a final evidentiary hearing for January 23, 2026. DE #42. Prior to that hearing, the Debtors, RBL and two junior lien creditors, Michael Schlesinger (and his P.A.) and Kobi Karp Architecture and Interior Design, negotiated an agreed order providing time for the Debtors to either refinance and payoff RBL or sell the Property and thereby payoff RBL.

10. On January 22, 2026, the Court entered the agreed order (DE #175). The January 22 agreed order deferred RBL's motion to give the Debtors time to either refinance or sell the Property. It gave the Debtors an opportunity to close on a refinancing on or before April 15, 2026 or, alternatively, file a sale motion on or before July 15, 2026, providing for an auction sale (with

allow a mediation to proceed if a party's representative appeared to lack capacity or was too medicated to knowingly participate or if any participant was suffering from pain that could impact the person's ability to understand the process. *Id.*, Tr. pp. 19-20.

[5] As this Court is aware, for a substantial period of time after these Chapter 11 cases were filed, the Debtors, through Adeena Weiss, represented that RBL's attorneys had drafted the state court's September 25, 2025 order. RBL disputed this assertion, and Adeena Weiss later admitted that Judge Rebull had drafted his own order.

or without a stalking horse) on or before August 15, 2026. DE #175 & DE #246, Ex. B (unredacted copy). The January 22 agreed order provided that, upon the Debtors' failure to meet either of these deadlines, RBL would be entitled to dismissal of the bankruptcy cases or to the appointment of a Chapter 11 trustee.

11. The January 22 agreed order provided that "RBL shall have the right to credit bid at the sale pursuant to 11 U.S.C. § 363(k) up to the full amount of RBL's Secured Claim." Paragraph 6, entitled "Acknowledgment of Debt," stated that the Debtors stipulate, and the Court determines, "that the amount owed to RBL is the foreclosure judgment amount of $20,978,128.54, plus statutory post-judgment interest from the date of entry of the foreclosure judgment, plus post-judgment attorneys' fees and costs in an amount agreed upon by the parties, or, if the parties cannot agree, as determined to be reasonable by this Court." The order defined this amount as "RBL's Secured Claim."

## The Debtors Miss the Deadlines

12. The Debtors did not refinance by the agreed deadline of April 15, 2026. Instead, the Debtors filed a motion to extend the April 15 date. DE #223. On April 20, 2026, the Court denied the Debtors' motion to extend the refinancing deadline. The Court stated: "Paragraph 9 of . . . [DE #175] (the "Agreed Order") set a deadline for the Debtors to close on a refinancing and cancel the sale process described in the Agreed Order. That deadline has expired and is not subject to extension, absent consent by RIC (Blue Lagoon) LLC ("RBL"). RBL did not consent to an extension at the April 17, 2026 hearing." DE #234, ¶ 1.

13. On July 15, 2026, the last day to file a sale motion, the Debtors filed two motions. One stated falsely that the Debtors were seeking to approve a sale to Alexis Homes for $40 million, subject to higher and better bids. DE #251 (replaced by DE #255). But the Debtors never executed

the Alexis Homes contract and made clear at the hearing that they were not seeking its approval, despite the title of their motion. The other July 15 motion sought, for a second time, an extension of the refinancing deadline. DE #250 (replaced by DE #254).

14. By order dated July 29, 2026 (DE #278), the Court denied both of the Debtors' July 15 motions. It denied the motion to extend the refinancing deadline with prejudice. DE #278, ¶ 6. As to the sale motion, the Court, on page 2 of its order, made a finding that the Debtors "failed to engage in the sale process consistent with the [January 22 order]." *Id*., p. 2.

**The Agreed Sale Procedures Order**

15. Despite the Debtors' non-compliance with the agreed deadlines set by the January 22 agreed order, the Court, in its July 29, 2026 order, gave the Debtors an opportunity to file an *agreed* sale motion by July 30, 2026 providing for an auction sale with or without a stalking horse. The Court provided that, if the Debtors did not accomplish this, it would enter an order requiring the appointment of a Chapter 11 trustee. *Id*., ¶ 4.

16. On July 30, the Debtors filed an agreed sale motion (DE #281) and submitted an agreed order. On July 31, 2026, the Court granted the agreed motion and entered an agreed order providing for an auction sale on August 14, 2026 (the "Sale Procedures Order"). DE #283. In the introductory paragraph of the agreed Sale Procedures Order, the Court specifically recited that the relief sought was agreed upon by RBL, Schlesinger and the Debtors and that the agreed motion was signed by Adeena Weiss Ortiz as representative of the Debtors.

17. The Sale Procedures Order confirms RBL's right to credit bid at the sale pursuant to 11 U.S.C. § 363(k). It contains a number of agreed provisions relating to RBL's credit bidding rights. The main ones are as follows:

Paragraph 2(c):

RBL is deemed to be a Qualified Bidder and, pursuant to 11 U.S.C. § 363(k), may credit bid the full amount of its secured claim against the Property (the "RBL Secured Claim," which, as of the date of the auction, is not less than $23,425,000.00, subject to adjustment through the date of the closing) (such credit bid, the "Credit Bid"). RBL may submit a bid consisting solely of a Credit Bid or a bid combining its Credit Bid with additional cash consideration (a "Credit Bid Plus Cash Bid"). RBL shall not be required to register, pay any deposit, or provide evidence of financial ability to close as a condition to bidding. For all purposes of evaluating and comparing bids at the auction, the full face amount of RBL's Credit Bid shall be deemed to have the same value as an equivalent amount of cash.

Paragraph 2(h):

Initial bids shall be submitted to the Debtors' broker, Jason A. Welt, who shall serve as the auctioneer, not later than two (2) business days before the auction sale date (by August 12, 2026). Initial bids must identify the bidder and purchase price; be irrevocable until the conclusion of the hearing to consider the approval of the sale (the "Sale Hearing"); not be conditioned on financing or due diligence or a title commitment or title policy, and include an acknowledgment of these Procedures.

Paragraph 2(i)

The Debtors' broker, as auctioneer, will announce the opening bid at the start of the auction. Overbids must be at least $50,000 above the then-current highest bid. The initial bid amount shall be the amount of RBL's Credit Bid.

Paragraph 2(j):

The Debtors' broker will identify the highest and best bid and the second and third highest and best bids, if any, as back-up bids, and the corresponding bidders, which may include a bid by RBL. Each back-up bid will remain open and binding until the closing of a sale to a higher ranked bidder. If the successful bidder fails to close, the Debtors may, without further auction, proceed to close with the next available back-up bidder on the terms of its bid.

Paragraph 2(k):

At the conclusion of the auction, the Debtors shall designate the highest and best bid as the successful bid, subject to Court approval at the Sale Hearing on August 19, 2026, at 3:30 P.M. The Debtors will promptly file after the auction a notice of auction results identifying the successful bidder and the back-up bidders. At the Sale Hearing, the Court will consider the bids and any objections to the sale or to the bids. Unless an objection is upheld or the Court finds other cause to invalidate the sale or any bid, the Court shall approve the sale and shall designate the highest and best bid and any qualified back-up bids.

Paragraph 2(q):

> RBL's Credit Bid, and any Credit Bid Plus Cash Bid, shall each constitute a Qualified Bid without the need for any registration, deposit, or additional documentation. As provided in subparagraph (c), for purposes of comparing bids, the full face amount of RBL's Credit Bid shall be treated as the equivalent amount of cash.

Paragraph 7 of the Sale Procedures Order preserved the rights of interested parties to object to a credit bid or credit plus cash bid made by RBL:

> If RBL is the successful bidder based on a Credit Bid Plus Cash Bid, such bid shall be considered a valid bid. All parties in interest reserve all rights to object to any bids, including any Credit Bid Plus Cash Bid, on any basis and seek any other relief.

However, paragraph 2(s) required that all such objections be served and filed at least two business days before the sale hearing. The sale hearing took place on August 19, 2026. *See* DE #297, ¶ 3(b) (changing the auction date to August 17 and the sale hearing date to August 19). Therefore, objections needed to be served and filed by August 17.

18. The Sale Procedures Order authorizes the making of back-up bids at the auction and specifically provides that RBL can make a back-up bid which can be a credit bid or a combined credit plus cash bid. The Sale Procedures Order does not provide that a back-up bid has to be made at the auction *before* a higher bid is made. The order provides that "[t]he initial bid amount shall be the amount of RBL's Credit Bid" and that "overbids" must be "at least $50,000 higher than the then-current highest bid." *Id.*, ¶ 2(i).

**The Ramos Contract**

19. Despite having agreed to the auction and the sale terms set forth in the Sale Procedures Order, the Debtors attempted to renege on them. On August 9, 2026, the Debtors filed a motion to change the sale from an open auction to a private sale to Jorge Ramos or assigns for a purchase price of $50 million (and to approve a joint venture agreement with Ramos and for other relief). DE #289. On August 11, 2026, the Debtors filed a motion requesting that the Court reconsider its July 29 order denying an extension of time to refinance with prejudice. DE #292.

20. On August 13, 2026, the Court entered an order denying the Debtors' motion to approve the private sale to Ramos and denying reconsideration of the earlier order denying an extension of time to refinance. DE #297. Nevertheless, in its August 13 order, the Court granted the Debtors some relief. It permitted the proposed private-sale buyer, Jorge Ramos, to participate in the auction if he paid a $500,000 deposit prior to the auction.[6] Based on representations made by the Debtors and their counsel, Ramos met that condition.

21. The auction took place on August 17, 2026. At the start of the video auction, the auctioneer, Jason Welt, announced that there were two qualified bidders, RBL and Ramos. DE #304, Tr. p. 8. Mr. Welt announced that he had received a credit bid from RBL in the amount of $23,425,000 and a cash bid from Ramos in the amount of $50 million. *Id*., p. 11.

22. Mr. Welt's statement was not entirely accurate. On August 12, five days before the auction, RBL made a written bid of $23,425,000 plus cash of $500,000. *See* Exhibit "1" to

[6] In addition, Ramos was required to post an additional $500,000 deposit immediately following the auction. According to Adeena Weiss, Ramos posted a total of $1,000,000 in deposits prior to the start of the August 17 auction. DE #304, Tr. p. 10 ("1 million has been put up by Jorge Ramos, 600,000 and another 400,000 today.").

Declaration of Peter H. Levitt (Ex. "B" hereto). RBL reserved the right to increase its bid at the auction. Mr. Welt forwarded RBL's counsel's email to Debtors' counsel, Mr. Aresty. *Id*.

23. At the August 17 auction, an individual named Sayed Moghani, acting as agent for Jorge Ramos, made Ramos's bid in the amount of $50 million. *Id*., p. 11. RBL, through its counsel, stated the Back-Up Bid: $23,425,000 credit plus $500,000 cash, subject to tax and code violation liens. This was the same bid RBL had made in writing to the auctioneer on August 12.

24. After RBL made this bid, Adeena Weiss objected to RBL adding cash to its credit bid.[7] Schlesinger made a similar objection, stating that he objected to RBL modifying its credit bid. Karp joined in that objection. Counsel for the U.S. Trustee reserved all rights. *Id*., pp. 12-15.

25. As noted above, the Sale Procedures Order (paragraph 2(s)) required that all objections to the auction and bids be made in writing and filed on August 17. Only Schlesinger met this requirement. Schlesinger filed a written objection (DE #301) to RBL's Back-Up Bid. Schlesinger objected that the credit plus cash back-up bid was made *after* Ramos made his $50 million bid and, therefore, did not qualify as a back-up bid under the terms of the Sale Procedures Order. DE #301, ¶ 12. On August 19, Karp filed a joinder in the Schlesinger objection. DE #305. The record does not indicate whether Schlesinger and Karp were aware of the pre-auction written credit plus cash bid RBL made. In any event, as discussed below, Schlesinger and Karp have settled with RBL.

26. The Debtors did not file any written objection to RBL's Back-Up Bid. On the day of the auction, August 17, the Debtors filed a "Notice of Auction Results" (DE #300) in which

[7] Adeena Weiss stated that the bid made for Ramos was also subject to taking the Property subject to real estate tax and code violation liens. DE #304, Tr. p. 13. Both bids, therefore, were on equal footing in this regard.

they recited that, at that auction, "other parties including the Debtors and Michael Schlesinger," had objected to RBL's Back-Up Bid.

27. No objecting party raised an objection, either during the auction or by writing in a timely-filed written objection, that RBL's combined credit plus cash bid should be disallowed because the fair market value of the Property allegedly exceeds the combined bid amount.

28. On August 19, 2026, the Court conducted a hearing to approve the sale to the high bidder, Jorge Ramos. By order dated August 27, 2026 (DE #310), the Sale Approval Order, the Court approved the sale to Ramos. It found that the sale process was fair, that there was no collusion, that adequate notice of the sale had been given, that adequate marketing had been conducted and that Ramos was a good faith purchaser. DE #310 (¶¶ e, i and j). The Court required that the closing on the sale to Ramos occur not later than September 10, 2026. *Id.*, ¶ 4. The Court reserved jurisdiction to consider the objections to RBL's Back-Up Bid in the event Ramos failed to close. *Id.*, ¶¶ U & 20. But the Court specified that the "Deferred Objections" were limited to the timely-filed objection of Schlesinger, joined in by Karp. Id., ¶ U.

**<u>Ramos Fails to Close</u>**

29. Ramos failed to close on or before September 10. On September 10, the Debtors filed an emergency motion to extend the September 10 deadline and a notice of non-closing. DE #336. On September 11, the Court entered an order extending the time for Ramos to close to September 24. DE #339, ¶ 2. The September 11 order set an evidentiary hearing, to take place on October 2, 2026, to consider further relief if Ramos failed to close by September 24. *Id.*, ¶ 5. The order also set deadlines to file a witness list and exhibits. *Id.*, ¶¶ 7 & 9.

30. On September 23, the Debtors filed another emergency motion to extend the closing date (DE #346), this one citing Caroline Weiss's deteriorating health. The Debtors sought an

extension to close to October 26. The Debtors also requested a modification of closing conditions previously imposed by the Court. The Court denied this motion by order entered on September 23, 2026. DE #348.

31. On September 25, 2026, the Debtors filed an Exhibit Register (for the scheduled October 2, 2026 evidentiary hearing) listing eight separate appraisals of the Property, performed at different times—Exhibits 12-14 and 17-21. DE #361. On the same day, the Debtors filed a Witness List listing several appraisers and real estate brokers and stating that they are expected to testify as to the value of the Debtors' Property. DE #360. Thus, the Debtors indicated that they intended to introduce testimony concerning the fair market value of the Property in an effort to oppose RBL's Back-Up Bid.

32. On September 28, 2026, the Debtors filed an emergency motion to continue the October 2, 2026 evidentiary hearing based on the death of Caroline Weiss, the Debtors' sole member. RBL did not oppose this relief. On September 29, 2026, the Court entered an order (DE #393) granting this motion, cancelling the October 2, 2026 evidentiary hearing (subject to rescheduling as needed) and setting a status conference on October 2, 2026.

33. At the status conference on October 2, the Court notified the parties that it would consider a motion by RBL for summary judgment as to the validity of its Back-Up Bid and whether the Court should approve that bid, subject to conducting further proceedings in the event summary judgment is denied.

34. By order entered on October 5 (DE #396), the Court set filing deadlines for the RBL summary judgment motion.

## MEMORANDUM OF LAW

## OVERVIEW

The issue before the Court is whether to approve RBL's Back-Up Bid: $23,425,000 credit plus $500,000 cash to be paid to the bankruptcy estate. RBL's bid is to acquire the Debtors' Property free and clear of all liens, encumbrances, claims and interests other than liens for unpaid real estate taxes and municipal code violations which will continue in effect.

The Court should approve the back-up bid for the following reasons:

1. Ramos failed to timely close, and, therefore, RBL is the sole bidder.

2. By agreed order, RBL had the right to make a credit bid or a credit plus cash bid. The amount of the credit was agreed upon. RBL used the agreed amount of credit and added $500,000 cash. RBL fully complied with the bid procedures.

3. The bid procedures did not require that RBL or any other bidder make a back-up bid before a higher bid. But the sequence is not even an issue because, in accordance with paragraph 2(h) of the Sale Procedures Order, RBL made its Back-Up Bid, a credit plus cash bid, in writing to the auctioneer on August 12. RBL restated that bid at the August 17 auction.

4. The Sale Procedures Order requires that any objection be made in writing and filed on August 17. Only one party met that requirement, Schlesinger. Schlesinger's sole written objection is the same as the one he expressed during the auction—that RBL could not improve its credit bid by adding cash *after* Ramos made a higher bid. That objection, joined in by Karp and the Debtors (at the auction), lacks merit.

5. The Court has authority to reject a credit bid "for cause." As explained below, however, the cases decided under Section 363(k)—the credit-bidding provision—make clear that

the "cause" requirement is not met merely by a showing that the fair market value of the property exceeds the amount of the credit bid.

**SUMMARY JUDGMENT STANDARD**

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the burden of demonstrating that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "At the outset, the moving party has the burden of demonstrating that there are no genuine issues of material fact, but once that burden is met the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial. Overcoming that burden requires more than speculation or a mere scintilla of evidence." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1121-22 (11th Cir. 2014) (citations omitted). *See also Anderson*, 477 U.S. at 252.

If there are no material facts in dispute, and only issues of law, summary judgment is appropriate. *Anderson* at 247-48. This is such a case.

## ARGUMENT

**I. A CREDIT BID, OR A CREDIT PLUS CASH BID, MADE AT A PROPERLY NOTICED AND DULY CONDUCTED AUCTION SALE SHOULD NOT BE REJECTED BASED ON A JUDICIAL VALUATION OF THE PROPERTY.**

Section 363(k) of the Bankruptcy Code provides:

> (k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property. 11 U.S.C. § 363(k).

The Supreme Court has emphasized the importance of a secured creditor's right to credit bid. In *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), the Court unanimously rejected a cramdown plan that sought to deprive a secured creditor of the right to credit bid and instead provided the creditor with the "indubitable equivalent" of its claim. The Court explained:

> The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan.

*Id*. at 644. The Court made clear that a secured creditor is not required to add cash to a credit bid. The Court also made clear that the courts are not free to add non-statutory limits on credit bidding. It stated that "the pros and cons of credit-bidding are for the consideration of Congress, not the courts." *Id*. at 649.

Neither § 363(k) itself nor any case precedent imposes any requirement that a credit bid be close to the fair market value of the assets purchased. The bankruptcy court retains discretion to deny or limit the credit bid "for cause," but no court has defined "cause" to include a requirement that the bid approximate fair market value or to require a bankruptcy court to conduct a valuation

hearing before approving a credit bid. On the contrary, courts have treated the "for cause" exception as narrow and demanding.

Bankruptcy courts have recognized that a denial of credit bid rights should be the extraordinary exception and not the norm. As one bankruptcy court explained,

> Here, Rabo, by virtue of its lien against the Properties, has a near absolute right to credit bid at sale, subject only to (a) a bona fide dispute as to the validity of its secured claim and (b) covering the costs of sale under section 506(c) of the Bankruptcy Code. [Citations omitted.] The bankruptcy court should only deny a section 363(k) credit bid right "when equitable concerns give it cause." *In re RML Dev., Inc.*, 528 B.R. 150, 155-56 (Bankr. W.D. Tenn. 2014). A denial of credit bid rights 'should be the extraordinary exception and not the norm.'

*In re Roberson*, No. 18-05432-5-JNC, 2020 WL 6265062, at *8 (Bankr. E.D.N.C. Oct. 23, 2020).

Bankruptcy courts have identified specific circumstances that may constitute cause to limit or deny credit bidding, none of which encompass the mere fact that a credit bid will not generate cash for junior creditors or equity. Cause has been found when the validity or amount of the creditor's lien is in bona fide dispute. *In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 593 (Bankr. S.D.N.Y. 2024) ("the validity of the Jefferies Entities' lien is hotly contested in these chapter 11 cases"). *See also In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (creditor whose mortgage lien and claim were disputed and the subject of equitable subordination request was not entitled to credit bid) (citing cases); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (mortgage creditor could not credit bid "because the validity of its liens and security interests are unresolved"), *aff'd*, 162 F.3d 1164 (8th Cir. 1998)). *See also In re RML Dev., Inc.*, 528 B.R. 150, 156 (Bankr. W.D. Tenn. 2014) (court limited amount of credit bid based on dispute concerning calculation of interest and reconciliation of payments).

Bankruptcy courts may deny a secured creditor's right to credit bid due to inequitable conduct. *See In re Free Lance-Star Publishing*, 512 B.R. 798, 804-08 (Bankr. E.D. Va. 2014)

(secured creditor bought loan and then engaged in an aggressive "loan-to-own" strategy designed to chill bidding). *See also In re Aloha Airlines, Inc*., 2009 WL 1371950, at *8 (Bankr. D. Haw. May 14, 2009) (credit bid would reward prepetition tortious conduct by competing airline). *See generally In re Figueroa Mountain Brewing, LLC*, No. 9:20-BK-11208-MB, 2021 WL 2787880, at *6-9 (Bankr. C.D. Cal. July 2, 2021) (discussing case law addressing the "for cause" requirement).

Research has not uncovered any published decision in which a bankruptcy court denied a credit bid, in the absence of some wrongful conduct or a challenge to the creditor's claim or lien, simply because the credit bid will not produce cash for junior creditors or equity holders. In *In re Theroux*, the court disapproved a trustee's private sale of a liquor license to the secured creditor because the sale price was a fraction of the value of the license, and the result would be that the state and local taxing authorities would not be paid. The court noted that the trustee had colluded with the secured creditor to wipe out the taxing authorities. The court stated, in *dicta*, in a footnote, and without citing authority, that, if the secured creditor was proposing to credit bid up to its $400,000 debt, it would disapprove that too because "there is no absolute entitlement to credit bid" and "that option would not be available where the sale price is so clearly inadequate." *In re Theroux*, 169 B.R. 498, 499 (Bankr. D.R.I. 1994).

The *dicta* in *Theroux*, to the extent it means that a credit bid can be disapproved if substantially below the value of the property, is inconsistent with other cases addressing the "cause" requirement. But the facts in *Theroux* are also distinguishable. There was no marketing of the liquor license, no adequately noticed public sale, and no competing bids. There was no agreement by the other lienors to allow the credit bid. And, while the court did not make specific findings that the trustee had engaged in wrongful conduct, it suggested that the trustee had a

conflict of interest and may have agreed to the sale in order to be compensated by the secured creditor.

"[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (internal quotation marks omitted). Congress prescribed a right to credit bid, and it did not state that the bankruptcy court must value the property to determine whether a credit bid is fair or whether it is the best option.

Here, RBL's claim was not disputed. On the contrary, the Debtors and the junior lienors agreed to the amount of RBL's secured claim and to RBL's right to credit bid its claim. RBL did not engage in inequitable conduct. On the contrary, although the loan matured nearly three years before the Chapter 11 cases were filed, and the Debtors filed the Chapter 11 cases one business day before an agreed foreclosure sale (and after the Debtors sought unsuccessfully to avoid their agreement and filed a motion that the state court termed a "farce"), RBL agreed to allow the Debtors adequate time either to refinance or sell the Property. The Debtors failed to meet deadlines they agreed upon, even after the sale closing deadline was extended several times by this Court.

In *Aventura Hotel*, the first mortgage creditor, owed approximately $20 million, made a nominal credit bid and acquired a vacant parcel in midtown Miami zoned for a hotel site. The Court approved the credit bid even though the property was sold free and clear of a second mortgage and the sale did not produce cash for unsecured creditors. *In re Aventura Hotel Props., LLC*, No. 21-12374-BKC-RAM, 2021 WL 3879337, at *5-6 (Bankr. S.D. Fla. Aug. 27, 2021).

In *Aventura Hotel* the Court did not value the real property. It simply noted that the "Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and

afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Property." *Id*. at *5. The same is true here.

Here, as the Court found, in finding I of the Sale Approval Order (DE #310), the Property "was actively marketed for several months, and the sale process was fair, reasonable, and adequate." The Court noted that it had entered an order on December 23, 2025 approving the Debtors' retention of a broker to market and sell the Property and that the "[b]roker marketed the Property, negotiated and conveyed offers to the Debtors, kept the Court and interested parties regularly apprised of updates in the sale process . . . ."

Here, as to the auction process, the Court found, in finding E of the Sale Approval Order, that "[t]he auction was conducted fairly, in good faith, and at arm's length, and its integrity was maintained. The Property was exposed to a competitive, court-approved bidding process open to all Qualified Bidders. The bids were not the product of fraud or collusion, and no bidder engaged in any conduct prohibited by 11 U.S.C. § 363(n). Each Qualified Bidder acknowledged that it had not engaged and would not engage in collusion, as required by the Sale Procedures Order."

These findings as to the marketing and auction process were not challenged by any party. Moreover, the auction did not take place until nearly 11 months after the petitions were filed. No one can say that the process was rushed or that the Property was not exposed to the market for an adequate period of time. Even though the Debtors presented a $50 million sale to Ramos, any interested party could have appeared at the auction and made a back-up bid. All they had to do was post a refundable $500,000 deposit and show proof of funds.

"Generally . . . the best way to determine the market value of property is to expose the property to the marketplace." *In re Mama's Original Foods, Inc*., 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (quoting *Bank of Am. NT & SA v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999)).

"Thus the market value of property that the trustee offers for sale is the highest price that an informed buyer is willing to pay after the property has been appropriately exposed to the marketplace for a reasonable period of time." *Id*. "The sale of property through an auctioneer is also presumptively at a market price, because the auctioneer makes a market for the property to be sold." *Id*. The Property was sold at auction after a substantial period of exposure to the market.

Credit bids are approved with regularity in bankruptcy courts (and state courts) even if the result is no distribution to junior creditors or equity holders. Here, because RBL will pay $500,000 in cash, and there is a forfeited $1 million deposit, there is more than enough money to pay all administrative expenses in full and make some distribution to the few other creditors who have asserted claims.

Congress granted secured creditors the right to credit bid; it did not condition that right on evidence that a property lacks equity or that the fair market value of the property is less than the amount of the credit bid. It could certainly have drafted section 363(k) to impose those conditions, but it did not. A judicial valuation process is not necessary because the auction process tests the market.

As the Third Circuit has explained, "no § 506 valuation is required before a § 363 sale of the underlying collateral can be approved," because § 363 "substitut[es] the theoretically preferable mechanism of a free market sale to set the price," on the premise "that the market's reaction to a sale best reflects the economic realities of assets' worth." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 460 (3d Cir. 2006). A secured creditor is therefore entitled to credit bid the full face amount of its allowed claim regardless of the economic value of the collateral. *Id.* at 459-60.

It would be error for the Court to deny the credit bid on the facts here. A ruling that credit bids can be challenged based solely on an allegation that the bid amount is less than market value

would turn every section 363 sale, with credit bidding, into a valuation hearing. The Court should not adopt that unprecedented approach.

## II. THE DEBTORS FAILED TO PRESERVE AN OBJECTION TO RBL'S BACK-UP BID BASED ON THE VALUE OF THE PROPERTY.

The terms for bidding, including all of the terms relevant to the credit bid and RBL's rights, were spelled out carefully in an agreed order, the Sale Procedures Order. While the Sale Procedures Order preserved the rights of parties to object to RBL's Back-Up Bid, that reservation cannot be read to negate the specific provisions of the order applicable to RBL's rights—*e.g.*, its right to credit bid at least $23,425,000, its right to add cash to its credit bid, its right to make a back-up bid, its right to have its credit bid treated as a cash bid, etc.

Based on the Debtors' Exhibit Register (DE #361) and Witness List (DE #360), both filed on September 25, 2026, the Debtors gave notice that they intend to object to RBL's Back-Up Bid based on their assertion that the fair market value of the Property is worth substantially more than the amount of RBL's Back-Up Bid. But the Debtors, and the other creditors as well, agreed to a procedure for making objections. The Debtors failed to comply with that procedure.

As stated in paragraph 2(s) of the order, all objections had to be served and filed two business days before the sale hearing. Only Schlesinger complied with this requirement. Even if the Debtors' August 17 auction report, briefly summarizing the verbal objections made at the auction, suffices to satisfy paragraph 2(s), the only objection made by the Debtors (and Schlesinger as well) is an objection to the timing of RBL's Back-Up Bid—not to the timing of RBL's credit bid but only to the timing of RBL's credit plus cash bid.

No one—either during the auction or in a written and timely filed objection—objected to RBL's Back-Up Bid on the basis that the bid amount is less than the fair market value of the Property. In any event, for the reasons discussed in Section I, a discrepancy between the bid

amount and the fair market value of an asset is immaterial under § 363(k) and is not "cause" to disapprove the bid.

In the Sale Approval Order, the Court fixed the universe of surviving objections, finding that "[n]o holder of any lien, claim, interest, or encumbrance on the Property, and no other creditor, has objected to the sale, except for the limited objection of" Schlesinger, "joined by" Karp, "directed solely to RBL's back-up bid." DE #310, ¶ U. The Court deferred consideration of Schlesinger's objections "to hear and determine them only if the sale to Ramos fails to close." *Id.*; *see also id.*, ¶ 20 (upon a failed closing, the Court "will schedule a hearing to consider the deferred objections to RBL's back-up bid"). The Debtors were not party to this reservation of jurisdiction.

The objection deadline in the Sale Procedures Order is binding and must be enforced as written. Enforcement of agreed orders is essential; to relieve a party of its agreed obligations "would undermine the authority of the Court and discourage parties from utilizing agreed orders in future bankruptcy proceedings." *In re SAL ATX LLC*, 660 B.R. 795, 817 (Bankr. W.D. Tex. 2024); *accord In re Mohajer 12 Corp.*, No. 18-2674, 2021 WL 287805, at *3-4 (Bankr. S.D. Ala. Jan. 22, 2021). A party's failure to assert a § 363 objection by a court-ordered deadline waives the objection. *In re EnvisioNet Computer Servs., Inc.*, 275 B.R. 664, 669 (D. Me. 2002).

The Debtors agreed to and submitted the Sale Procedures Order, yet failed to file a timely objection raising the valuation issue or, for that matter, any other issue concerning the Back-Up Bid. The Debtors' equity holder did not file an objection, and, though counsel for the U.S. Trustee stated a reservation of rights at the auction, the U.S. Trustee did not file any objection either. Only Schlesinger timely complied with the agreed procedure for asserting objections. Even if the Debtors are deemed to have made a timely objection, they did not object based on valuation.

## III. THE OBJECTION BASED ON THE TIMING OF RBL'S BACK-UP BID LACKS MERIT.

Initially, it should be noted that no one made an objection, orally or in writing, to RBL's credit bid--$23,425,000—as constituting a valid back-up bid. Therefore, the effect of the timing objection to the credit plus cash bid, if sustained, would be to deprive the estate of $500,000 in cash. But, in any event, the timing objection lacks merit.

Nothing in the Sale Procedures Order requires that a back-up bid be made before the bid determined to be the highest bid. RBL made its credit plus cash bid before the auction and again at the auction before the auction closed.

Paragraph 2(j) of the Sale Procedures Order provides that the "Debtors' broker will identify the highest and best bid and the second and third highest and best bids, if any, as back-up bids, and the corresponding bidders, which may include a bid by RBL. Each back-up bid will remain open and binding until the closing of a sale to a higher-ranked bidder."

The Sale Procedures Order expressly authorized the very bid RBL made. Paragraph 2(c) provides that RBL "may submit a bid consisting solely of a Credit Bid or a bid combining its Credit Bid with additional cash consideration (a 'Credit Bid Plus Cash Bid')." Paragraph 2(q) confirms that a Credit Bid Plus Cash Bid "shall . . . constitute a Qualified Bid" without the need for any registration, deposit, or additional documentation.

To the extent this objection relies on the requirement that subsequent bids must exceed prior bids by $50,000, that is a requirement for an "Overbid," not for a back-up bid. Paragraph 2(i) of the Sale Procedures Order provides that "Overbids" must be at least $50,000 above the then-current highest bid. RBL did not make an "overbid." RBL is not claiming that it made an "overbid." RBL made a back-up bid, not an overbid. The $50,000 increment requirement applies to overbids, not to back-up bids.

The purpose of a back-up bid is obvious. It is to have another bid in place in case the high bidder fails to close, as occurred here. That purpose would be frustrated if a qualified bidder was not permitted to up its bid after a higher bid and designate that increased bid as a back-up bid. And, again, nothing in the Sale Procedures Order provides that a back-up bid cannot be made after the bid determined to be the highest bid.

RBL could not find any reported bankruptcy case in which the high bidder at a section 363 auction sale failed to close, and the court disapproved a back-up bid made before the closing of an auction on the ground that it was made after the high bid. In *In re Zacky Farms, LLC*[8], No. 12-37961-B-11, 2010 WL 11821247, at *4 (Bankr. E.D. Cal. Sept. 21, 2010), the court deemed a back-up bid that was increased by the bidder *after the auction* to be a valid back-up bid.

Further, to the extent any timing or sequencing requirement existed, and none did, RBL made its credit plus cash bid five days before the August 17 auction. In this regard, paragraph 2(h) of the Sale Procedures Order provides:

> Initial bids shall be submitted to the Debtors' broker, Jason A. Welt, who shall serve as the auctioneer, not later than two (2) business days before the auction sale date (by August 12, 2026).[9] Initial bids must identify the bidder and purchase price; be irrevocable until the conclusion of the hearing to consider the approval of the sale (the "Sale Hearing"); not be conditioned on financing or due diligence or a title commitment or title policy, and include an acknowledgment of these Procedures.

RBL's credit bid was deemed an initial bid under paragraph 2(i) of the Sale Procedures Order. RBL did not have to make any other bid before the auction or even confirm that initial bid. But there was nothing to stop RBL from raising its bid before the start of the auction. It did so on August 12. On August 12, counsel for RBL wrote to the auctioneer stating:

---

[8] The Westlaw date for this decision appears to be wrong. The date of the court's decision is actually February 21, 2013, not September 21, 2010.

[9] The auction sale date changed to August 17, 2026.

> Please be further advised that RBL has decided that, at the auction, it will make a "Credit Bid Plus Cash Bid." RBL will pay at least $500,000 in cash over its Credit Bid, and it will accept title subject to real estate taxes and City of Miami code violation liens.

RBL made its credit plus cash bid *before* Ramos made his $50 million bid at the auction. There was no "speak first" requirement. But if there was such a requirement, RBL spoke first.

## IV. RBL FULLY COMPLIED WITH THE BID PROCEDURES IN THE SALE PROCEDURES ORDER.

The only objection that any party has timely raised concerning RBL's compliance with the bid procedures is the objection discussed above concerning the timing of RBL's Back-Up Bid. That objection lacks merit for the reasons stated above. RBL fully complied with the bid procedures in the Sale Procedures Order.

## V. ALLOWED ADMINISTRATIVE EXPENSES WILL BE PAID, THE GOVERNMENTAL ENTITIES ARE NOT PREJUDICED, AND RBL HAS SETTLED WITH SCHLESINGER, KARP AND WEISSMAN & DERVISHI.

The $500,000 that RBL will be paying in cash is sufficient to cover allowed administrative expenses, including the Debtors' counsel's allowed fees and U.S. Trustee quarterly fees. In addition, it is likely that the $1,000,000 deposit paid by Ramos will be forfeited to the estate.

RBL will be purchasing the Property subject to real estate taxes and code violation liens. RBL will be responsible for paying the outstanding real estate taxes and code violation fines to the extent not paid in full by the Debtors' estate from available funds. Thus, the governmental entities will not be prejudiced by a sale to RBL based on its Back-Up Bid. Neither of them has objected to the Back-Up Bid.

RBL has entered into a confidential settlement with lien creditors Schlesinger and Karp and unsecured creditor, Weissman & Dervishi, P.A. As a result of the settlement, which was briefly described at the status conference on October 2, 2026, Schlesinger, Karp and the law firm of

Weissman & Dervishi are required to support the approval of RBL's Back-Up Bid. In any event, and independent of the settlement, RBL is entitled to approval of its Back-Up Bid for the reasons set forth above.

## CONCLUSION

A bankruptcy court can disallow a credit bid for cause, but it cannot disallow a first lienholder's credit bid solely because the credit bid amount may be less than the fair market value of the property, a fact that, in any event, has never been proven in this case. The marketing and auction process tested the market. Once a court finds that a property is adequately marketed and that the auction sale procedures are fair, and that proper notice of the auction has been given, that should end the inquiry.

Neither the Debtors nor any other party has or can demonstrate "cause" to disallow RBL's Back-Up Bid. No party even preserved an objection based on valuation, and the only objection that was timely and properly made, the Schlesinger objection, concerns the sequencing of the Back-Up Bid. The Debtors never made an objection, either at the auction itself or by filing a timely written objection, that RBL's Back-Up Bid should be disapproved based on the value of the Property. At the auction, the Debtors, through Adeena Weiss, merely stated that RBL could not add cash to its credit bid and joined in the timing objection Schlesinger made. For the reasons discussed above, that objection lacks merit.

Finally, RBL has entered into a confidential settlement agreement with Schlesinger, Karp and the Weissman & Dervishi law firm, the only creditors who may be impacted adversely by RBL's acquisition of the Property based on its Back-Up Bid. They will be withdrawing their objections.

**WHEREFORE**, for all of the foregoing reasons, RBL's Back-Up Bid should be approved, the Debtors should be required to convey the Property to RBL upon RBL's payment of the cash portion of its bid, and the Court should reserve jurisdiction to enter such other and further relief as may be just, proper and necessary to implement its prior orders and to assure that RBL obtains the benefit of its successful bid.

Respectfully submitted,

*/s/ Peter H. Levitt*
Peter H. Levitt, Fla. Bar No. 650978
plevitt@shutts.com
Vincent F. Alexander, Fla. Bar No. 68114
valexander@shutts.com
Shutts & Bowen LLP
200 South Biscayne Blvd., Suite 4100
Miami, Florida 33131
Telephone: (305) 358-6300
***Counsel for RIC (Blue Lagoon) LLC***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 23, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or *pro se* parties who are authorized to receive electronically Notice of Electronic Filing in these bankruptcy cases.

*/s/ Peter H. Levitt*
Peter H. Levitt